UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRIST RICHARDSON,<br><br>        Plaintiff,<br><br>   v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>        Defendant. | Case No.: 1:11-cv-01783 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF CRIST RICHARDSON |

Crist Richardson ("Plaintiff") asserts he is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge ("ALJ") erred in evaluating the medical records and assessing his subjective complaints. Therefore, Plaintiff seeks judicial review of the administrative decision denying benefits. For the reasons set forth below, the ALJ's decision is **AFFIRMED**.

**PROCEDURAL HISTORY**

Plaintiff filed applications for disability insurance benefits and supplemental security income on May 15, 2008, alleging disability beginning May 6, 2008. (Doc. 11-3 at 12). The Social Security Administration denied his claims initially and upon reconsideration. *Id*. After requesting a hearing, Plaintiff testified before an ALJ May 6, 2010. *Id*. The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on September 4, 2009. *Id.* at 12-23. Plaintiff requested a review by the Appeals Council of Social Security, which denied review of

1

the ALJ's decision on June 18, 2010. *Id.* at 2-4. Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). When a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider objective medical evidence and testimony. 20 C.F.R. §§ 404.1527, 416.927, 416.929.

**A.     Relevant Medical Evidence**

Plaintiff participated in chemical abuse group counseling from May to June 2008. (*See* Doc. 11-8 at 14-77). Discussion topics included building support systems, using skills to maintain sobriety, and relapse prevention. *See, e.g., id.* at 14, 20, 32. Melody Lewis noted Plaintiff seemed "very attentive to information provided and group discussions," but still appeared "to need a lot of attention." *Id.* at 14. Likewise, Ceri Hulugalle believed Plaintiff exhibited "attention-seeking behavior" during his group therapy sessions. *Id.* at 20, 23.

On July 23, 2008, Dr. Bobba noted Plaintiff stated he could only walk one block, but was "not alleging a physical condition." (Doc. 11-8 at 78-79). Dr. Bobba opined Plaintiff's physical impairment was "non severe." *Id.* at 79.

Dr. Alan Goldberg completed a mental residual functional capacity assessment and psychiatric review technique form on August 1, 2008. (Doc. 11-8 at 80-97). According to Dr. Goldberg, Plaintiff was "not significantly limited" in his ability to understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; and complete a normal work-day and workweek without interruptions from psychosocially based symptoms. *Id.* at 80-81. However, Plaintiff was "moderately limited" in his ability to understand, remember, and carry out detailed instructions. *Id.* at 80. Further, Dr. Goldberg opined Plaintiff had 'mild" limitations in his activities of daily living and maintaining social

functioning, and "moderate" difficulty in maintaining concentration, persistence, or pace. *Id.* at 94. Dr. Goldberg concluded Plaintiff's impairment was not expected to last twelve months. *Id.* at 84.

On November 5, 2008, Dr. Philip Walls completed a psychiatric review of the record, and concluded Plaintiff suffered from an affective disorder, substance abuse in alleged remission and a bipolar disorder. (Doc. 11-9 at 30- 39). Dr. Walls opined an intellectual functioning test would be helpful to assess Plaintiff's "alleged poor memory [and] current mental status." *Id.* at 42.

Dr. Emanuel Dozier performed a comprehensive internal medicine evaluation on November 19, 2008. (Doc. 11-9 at 47-51). Plaintiff reported his arthritis caused "stiffness in the morning that last[ed] 30 minutes." *Id.* at 47. In addition, Plaintiff informed Dr. Dozier that he had "limitations on standing and walking to one hour for standing, one block for walking, sitting 20 minutes, and lifting 50 pounds." *Id.* Further, Plaintiff reported his pain was "10/10," and it was "aggravated with bending, twisting, stopping, standing longer than one hour, walking more than one block, sitting more than 20 minutes, and lifting more than 50 pounds." *Id.* at 48. Dr. Dozier observed Plaintiff walked "with a left antalgic gait" and "would benefit from the use of a cane." *Id.* at 48, 51. Based upon the examination, Dr. Dozier opined Plaintiff would be able to sit, stand, or walk up to six hours; lift ten pounds frequently and twenty pounds frequently. *Id.* at 50-51. In addition, he determined Plaintiff "would have postural restrictions on occasional bending, stooping, crouching, pushing, and pulling due to the back, chronic obstructive pulmonary disease, and arthritis. *Id.* at 51. Finally, Plaintiff required "environmental restrictions on temperature extremes of heat, cold, dust, fumes, occasional climbing ladders, working on inclined planes or uneven terrain without the aid of a cane." *Id.*

On December 10, 2008, Dr. Frye prepared a physical residual functional capacity assessment. (Doc. 11-9 at 52-57). According to Dr. Frye, Plaintiff had the ability to lift ten pounds frequently and twenty pounds occasionally, stand and/or walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day. *Id.* at 53. Dr. Frye opined Plaintiff was limited in his ability to push and pull with his lower extremities. *Id.* Further, Plaintiff could never climb ladders, ropes, or scaffolds; but could climb ramps and stairs occasionally. *Id.* at 54-55. Also, Dr. Frye determined Plaintiff was limited to occasional stooping, kneeling, crouching, and crawling due to his low back pain with radiation into his legs. *Id.* at 55.

Dr. Kimball Hawkins performed a psychological evaluation to determine Plaintiff's intellectual functioning on January 12, 2009. (Doc. 11-9 at 58-63). Plaintiff informed Dr. Hawkins that he had attended special education classes and had a tenth-grade education. *Id.* at 59. Plaintiff reported "he stopped working because he had a nervous breakdown because of stress." *Id.* Dr. Hawkins opined Plaintiff's test scores on the Bender Gestalt II and Wechsler Adult Intelligence Scale- III tests were "in the significant sub-average range." *Id.* at 61. According to Dr. Hawkins, "The scores [were] lower than what one would expect of someone with his history, although it may be the root of many of his problems." *Id.* Dr. Hawkins concluded:

> His ability to understand, remember, and carry out complex instructions is poor. His ability to understand, remember, and carry out simple instructions is adequate on familiar tasks. His ability to maintain concentration, attention, and persistence is poor. His ability to perform activities within a schedule and maintain regular attendance is poor presently. His ability to complete a normal work day and work week without interruptions from psychologically based symptoms is poor. His ability to respond appropriately to changes in work setting is poor. His ability to manage his own money is considered to be poor.

*Id.* at 61. In addition, Dr. Hawkins noted Plaintiff was "able to read simple notes and messages, but does not write well and has poor spelling. *Id.* at 60. Dr. Hawkins found Plaintiff had a borderline score on his malingering test. *Id.* at 61. In conclusion, Dr. Hawkins opined Plaintiff had a "[m]ild intellectual disability. *Id.* at 63.

On February 14, 2009, Dr. Luu completed a psychiatric review technique and mental residual functional capacity assessment. (Doc. 11-9 at 64-77). Dr. Luu opined Plaintiff had mild difficulties with his activities of daily living and in maintaining concentration, persistence, or pace. *Id.* at 72. In addition, Dr. Luu found Plaintiff was "moderately limited" in his ability to interact appropriately with the general public, and ability to understand, remember, and carry out detailed instructions. *Id.* at 75-76. Plaintiff was "not significantly limited" in other areas of understanding, memory, concentration, persistence, and adaption. *Id.* Specifically, Dr. Luu opined Plaintiff's concentration and persistence was "sufficient ability to carry out short instructions, perform activities with directions without additional support and to maintain attention in 2-[hour] increments, perform activities within a schedule, maintain regular attendance, and to be punctual with customary routine. *Id.* at 77. Further, Dr. Luu determined Plaintiff's memory was "sufficient . . . to remember locations and work-like

5

procedures, understand and remember simple instructions." *Id.* Dr. Luu concluded Plaintiff could perform simple repetitive tasks with limited public contact. *Id.*

Dr. Mark Harashasky offered an assessment of Plaintiff's mental impairment on August 9, 2010. (Doc. 11-12 at 25-27). Dr. Harashasky opined Plaintiff's ability to understand, remember, and carry out instructions was impaired; Plaintiff had "mild" limitations with simple instructions, and "moderate" limitations with complex instructions. *Id.* at 25. According to Dr. Harashasky, Plaintiff "suffers from a depressed mood, which may impair his ability to carry out executive functioning." *Id.* In addition, Dr. Harashasky opined "his emotional state may affect his ability to function socially/ occupationally." *Id.* at 26.

**B.     Hearing Testimony**

*Plaintiff's testimony*

Plaintiff testified before the ALJ on May 6, 2010. (Doc. 11-3 at 31). Plaintiff reported he had a ninth-grade education because he dropped out of school in the tenth grade. *Id.* at 35. He said he was unable to read above a second grade level. *Id.* at 52. Plaintiff testified he had limited vocational training and had been trained "hands on working on IBM typewriters" during the 1980s. *Id.* at 35.

According to Plaintiff, he last worked at a Wal-Mart as part of the maintenance crew. (Doc. 11-3 at 40). He said his duties included cleaning bathrooms, mopping the floors, and cleaning up spills. *Id.* Plaintiff estimated that the cart he pushed around was between 75 and 100 pounds, and that he had to lift a maximum of ten pounds. *Id.* According to Plaintiff, he performed maintenance at a Ramada Express hotel prior to working at Wal-Mart. *Id.* at 36. He testified that Ramada hired him "as a maid to clean rooms." *Id.* After six months, Plaintiff became a "houseman," and Plaintiff reported the work required him to "empt[y]the maid's carts, trash and linens from the rooms." *Id.* Plaintiff estimated he had to lift "[a]bout 100 pounds, 150 pounds" while performing these duties because the "linen bags can get pretty heavy." *Id.* at 37. Also, Plaintiff also worked "deep cleaning lobbies," which required him to lift "maybe 10 pounds," and performing general janitorial duties, such as fixing items in rooms and painting. *Id.* at 37-38.

Plaintiff reported he was no longer able to work after suffering "a nervous breakdown at Wal-Mart." (Doc. 11-3 at 39). Plaintiff explained: " Pressure was building up. I didn't know I was bipolar,

didn't know I had to take medicine." *Id.* Also, Plaintiff reported his leg "went numb" due to arthritis in November 2009. *Id.* at 41-42. Noting Plaintiff was collecting unemployment and the numbness in Plaintiff's leg started after his application date, the ALJ questioned why Plaintiff was seeking Social Security benefits. *Id.* at 40-41. Plaintiff responded that he "needed income," and filed for benefits in anticipation of his impairments worsening:

> Q: Why is it you actually made the application for disability?
>
> A: Well, you know, I, I knew sooner or later I was, since I was, I was diagnosed with bipolar I might as well file for my Social Security now then [sic] five years down the road when I'm, can't do nothing. And now I can't do nothing now.
>
> Q: So are you telling me that when you applied you could do things? You could work at the time you applied?
>
> A: No, I could, I could work and then I couldn't work.
>
> Q: Okay, it's pretty easy. You applied for disability and said you weren't able to do any work. Why is it you couldn't work?
>
> A: Well, my knee for one thing, the arthritis that I've had for many years.
>
> Q: But you said two years ago when you applied it wasn't bothering you that much.
>
> A:  It wasn't bothering me that bad, no. But I knew it—
>
> Q: All right.
>
> A: —was going to.

(Doc. 11-3 at 43-44).

Plaintiff believed he could no longer work because of the constant pain in his left knee. (Doc. 11-3 at 44). Plaintiff described the pain as "sharp" and compared it to "a nail or like going in and out." *Id.* The ALJ asked Plaintiff to describe his pain level on a scale of one to ten, and explained: "One is you're not having much of a problem, it's bothering you but not very much, ten you're on your way to the emergency room." *Id.* at 45. Plaintiff responded that without his prescription pain medicine, his pain was a "[n]ine and a half." *Id.* With medication, he reported the pain was an "[e]ight." *Id.* According to Plaintiff, walking made his knee hurt more, and his knee did not hurt if he was sitting down. *Id.* at 46. He reported that he was not prescribed a cane, but purchased one to help him walk. *Id.* at 44.

He testified he took medication for his bipolar disorder, and said the medication helped him sleep and not hear voices. (Doc. 11-3 at 46-47). He stated that he saw a doctor about every two months for treatment. *Id.* at 46. Plaintiff reported the physician talked to him to see if he was suicidal, and one time they called the police because he was suicidal. *Id.*

When considering his limitations and abilities, Plaintiff estimated he could lift "maybe ten pounds for six hours." (Doc. 11-3 at 47). He believed he could stand at one time for "[n]o longer then [sic] twenty minutes to half-hour," or a total of four hours in an eight-hour day. *Id.* Plaintiff reported he could walk for three to four minutes before he needed to stop. *Id.* at 48. He believed he could not sit for more than fifteen to thirty minutes—or a total of four hours in an eight-hour day. *Id.* Plaintiff said he needed to lie down for an hour each day. *Id.*

In addition, Plaintiff reported he could not bend, squat, crouch, knee, climb a ladder, or crawl on his hands and knees. (Doc. 11-3 at 48-49). Plaintiff said he was unable to pick up coins without difficulty. *Id.* at 50. However, Plaintiff said he was able to hold something like a glass of water, and feel a table to determine whether it was smooth or rough. *Id.* He believed he could climb two or three stairs with the assistance of a handrail, which he did when taking a public bus. *Id.* at 49.

Plaintiff testified he no longer cooked or performed many household chores because he lived with his fiancée and she "won't let [him]." (Doc. 11-3 at 54). Plaintiff reported he took out the trash, watered the yard, and he accompanied his fiancée while grocery shopping. *Id.* at 55. Further, he enjoyed activities such as camping and fishing. *Id.*

*Vocational expert's testimony*

Linda Fair, a rehabilitation counselor and vocational expert ("VE"), testified after Plaintiff at the hearing. The VE characterized Plaintiff's past relevant work as "housekeeping, cleaner." (Doc. 11-3 at 59-60). As generally performed, the work was "unskilled . . . and light in exertion." *Id.* at 60. However, the VE observed that, as Plaintiff described it, the work "was heavy as performed." *Id.* The work as a hotel clerk was "semiskilled at an SVP:[1] 4 and light in exertion." *Id.* Further, the VE

---

[1] "SVP," or specific vocational preparation, is defined as the amount of lapsed time required by a typical worker to learn techniques, acquire information, and develop the facility needed for average performance in a specific job position. Employment and Training Admin., U.S. Dep't of Labor, *Dictionary of Occupational Titles*, (4th ed. rev. 1991), page 1009.

classified the "janitorial, maintenance jobs as a cleaner, commercial or institutional, which is unskilled at an SVP: 2 and heavy." *Id.* However, as Plaintiff performed the maintenance work, "it was actually light." *Id.*

The ALJ asked the VE to consider a hypothetical individual "the same age, education, language and work background as the claimant." (Doc. 11-3 at 60). The ALJ explained the worker could lift and carry 20 pounds occasionally, and 10 pounds frequently; stand, sit, or walk six hours in an eight-hour day; occasionally balance, stoop, kneel, crouch, crawl and climb ramps or stairs; and push or pull occasionally with the left lower extremities. *Id.* at 61. However, the worker could "never climb ladders, ropes or scaffolds" and was required to "avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, poor ventilation, and hazards like moving machinery and heights." *Id.* The VE opined that with these conditions and limitations, the hypothetical worker would be able to perform Plaintiff's past relevant work as a hotel clerk. *Id.* The VE observed the housekeeping, cleaner position would be eliminated "due to exposure to the cleaning solutions." *Id.*

Next, the ALJ added mental limitations, and stated the hypothetical worker "could perform simple, routine tasks" and should have only "occasional contact with the general public." (Doc. 11-3 at 61). With these additional limitations, the VE opined the hotel clerk position would be eliminated. *Id.* The VE concluded the worker would be able to perform other unskilled, light work in the national economy, such as assembler (*DOT*[2] 712.687-010), packing line worker (*DOT* 753.687-038), and laundry worker (*DOT* 302.685-010).

Finally, the VE considered a worker who had the same conditions and limitations as the first two hypothetical individuals, but was also "unable to maintain attention and concentration sufficiently for two-hour period [and] unable to even occasionally perform activities within a schedule." (Doc. 11-3 at 62). The VE concluded the worker would not be able to perform Plaintiff's past relevant work, or any other work in the national economy. *Id.*

---

[2] *The Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

**C.    The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity from the alleged onset date of May 6, 2008. (Doc. 11-3 at 14, AR at 13). Second, the ALJ found Plaintiff had the following severe impairments: disorder of the back, affective mood disorder, and history of substance addiction. *Id.* These impairments did not meet or medically equal a listing. *Id.* at 14. Specifically, Plaintiff's spinal impairment did not meet the criteria of Listing 1.04, and his mental impairments did not meet Listings 12.04 and 12.09. *Id.* Next, the ALJ determined:

> The claimant has the residual functional capacity[3] to lift and carry 20 pounds occasionally and ten pounds frequently. He is able to stand and/or walk for a total of six hours and sit for six hours in an eight-hour workday. He is able to push and pull occasionally with the left lower extremity and must use a can for uneven ground and inclined planes. He is able to balance, stoop, crouch, craw, knee, and climb ramps and stairs occasionally, but never climb ladders, ropes, and scaffolds. He must avoid exposure to heat, cold, fumes, odors, dust, gases, moving machinery, and unprotected heights. . . . Furthermore, I find the claimant has the residual mental functional capacity such that he is limited to the performance of simple repetitive tasks with limited public contact, but is able to perform all other mental functions of work.

*Id.* at 15. With this RFC, Plaintiff was unable to perform past relevant work. *Id.* at 21. However, the ALJ determined Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.* at 22. Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. *Id.*

## DISCUSSION AND ANALYSIS

**A.    The ALJ's decision to afford less weight to the opinion of Dr. Hawkins, an examining physician, was supported by substantial evidence.**

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on

---

[3] The residual functional capacity is a determination of what a claimant "can still do despite [his] limitations." 20 C.F.R. § 404.1545.

the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Also, an examining physician's opinion is given more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(2).

An ALJ may reject the contradicted opinion of a physician with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the court when there is "more than one rational interpretation of the evidence." *Id.*; *see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). The opinion of an examining physician may be rejected whether or not the opinion is contradicted by another. *Magallanes*, 881 F.2d at 751.

Plaintiff contends, "[T]he ALJ failed to articulate legally sufficient rationale to reject Dr. Hawkins' opinion." (Doc. 12 at 10). According to Plaintiff, "The ALJ has neither offered a legitimate conclusion or a reason why he rejects the opinions of Dr. Hawkins documenting [his] severe impairment and resulting limitations." *Id.* at 11. On the other hand, Defendant argues the ALJ provided "valid reasons for rejecting [the] examining source's opinion." (Doc. 13 at 11).

In the discussion of the medical evidence, the ALJ noted "little weight" was given to the opinion of Dr. Hawkins because "the opinion lacks support in the record." (Doc. 11-3 at 20). The ALJ explained the "estimated IQ scores are not consistent with the claimant's level of functioning," because he was able "to hold a good paying job for a number of years." *Id.* The ALJ determined "Dr. Hawkins' opinion was internally inconsistent," because "Dr. Hawkins rated the claimant's abilities as 'poor' in every area, yet said he could perform simple tasking . . ." *Id.* In addition, the ALJ noted several other findings he believed were inconsistent within the opinion:

> Dr. Hawkins stated that the claimant had some depressive symptoms, but did not endorse severe depression. He said the claimant had symptoms of a cognitive disorder, but did not find that the claimant had psychotic symptoms. He referred to the claimant's "intellectual disability" as mild.

(Doc. 11-3 at 20). Moreover, although Dr. Hawkins noted Plaintiff "had a poor ability to maintain concentration, attention, and persistence," the ALJ noted treatment notes demonstrated "the claimant had normal concentration and attention . . . [and] he was able to maintain concentration and to answer appropriately for almost an hour in a stressful situation." *Id.* at 16, 20. Therefore, the ALJ gave little weight to the opinion for its internal inconsistencies and its inconsistency with Plaintiff' conduct. These were specific, legitimate reasons for discounting the opinion of Dr. Hawkins.

The Ninth Circuit explained an opinion may be rejected where there was incongruity between a physician's assessment and his records. *See, e.g., Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (the ALJ gave specific and legitimate reasons for rejecting the treating physician's opinion by explaining why it "did not mesh with her objective data or history"). A medical opinion may be rejected when it is "unsupported by the record as a whole." *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003). In addition, the ALJ's personal observations are relevant to the disability determination. *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1999) (an ALJ may draw logical inferences); *Drouin v. Sullivan*, 966 F.2d 1255, 1258-59 (9th Cir. 1992). Accordingly, the ALJ set forth specific, legitimate reasons for giving less weight to the opinion of Dr. Hawkins.

Importantly, the decision to give less weight to the opinion of Hawkins was supported by substantial evidence in the record. The Commissioner explained both medical and nonmedical evidence may constitute substantial evidence:

> [Substantial evidence] is intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong. It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion.

1996 SSR[4] LEXIS 9 at *8. Here, the ALJ found the opinion of Dr. Luu was "consistent with the evidence pertaining to the claimant's mental health symptoms and treatment" (Doc. 11-3 at 18), and the opinion is substantial evidence in support of the ALJ's decision. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) ("Although the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's

---

[4] Social Security Rulings are issued by the Commissioner to clarify regulations and policies. Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record") (citing *Magallanes*, 881 F.2d at 752).

Consequently, the ALJ carried his burden to summarize of the facts and conflicting clinical evidence, state his interpretation thereof, and make findings. *Cotton v. Bowen*, 799 F.2d at 1403, 1408 (9th Cir. 1986). Although the evidence may be "susceptible to more than one rational interpretation," the ALJ's set forth specific, legitimate reasons to give less weight to the opinion of Dr. Hawkins, and the decision is supported by substantial evidence in the record. Therefore, this Court must uphold the evaluation of the medical evidence. *See Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Matney*, 981 F.2d at 1019.

**B.    The ALJ set forth clear and convincing reasons, supported by substantial evidence, in his credibility determination.**

In determining credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Here, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 11-3 at 21). However, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible . . ." *Id.* Plaintiff asserts the failed to apply the proper legal standards in assessing his subjective symptom testimony. (Doc. 12 at 16-24).

An adverse finding of credibility must be based on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ may not discredit a claimant's testimony as to the severity of symptoms only because it is unsupported by objective medical evidence. *See Bunnell*, 947 F.2d at 347-48. In addition, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

Factors that may be considered include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Here, the ALJ considered the objective medical record and treatment, Plaintiff's activities of daily living, and inconsistencies in his statements and conduct. (Doc. 11-3 at 21-22).

*Objective medical evidence*

Generally, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit stated, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.").

Here, the ALJ did not base his decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff. Thus, the objective medical evidence was a relevant factor in determining Plaintiff's credibility. However, in citing to the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a general statement that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Although Plaintiff "alleged back pain with radiation down his leg," the ALJ noted, "lumbar X-rays were normal." (Doc. 11-3 at 21). Therefore, the ALJ carried his burden to "explain what evidence undermines the testimony." *See Holohan*, 246 F.3d at 1208. Thus, the objective medical evidence was a proper consideration by the ALJ in determining Plaintiff's credibility.

*Treatment received*

In assessing Plaintiff's credibility about his symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529(c). Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999). The Ninth Circuit has "indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007).

The ALJ observed Plaintiff's "X-rays show degenerative changes, but the level of treatment is not commensurate with severe osteoarthritis." (Doc. 11-3 at 21). Notably, when an impairment "can be controlled effectively with medication," the impairment cannot be considered disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). Consequently, the treatments given to Plaintiff were considerations by the ALJ.

*Inconsistencies*

The Ninth Circuit explained an ALJ may consider "conflicts between the claimant's testimony and his conduct, or internal contradictions in testimony." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004) (citing 20 C.F.R. § 404.1529(c); *Smolen*, 80 F.3d at 1281; *Bunnell*, 947 F.2d at 346). First, the ALJ observed that, in spite of Plaintiff's alleged mental impairment, "he was able to maintain concentration and to answer appropriately for almost an hour in a stressful situation." (Doc. 11-3 at 15, 21). In addition, the ALJ noted Plaintiff gave inconsistent statements regarding his educational background, because Plaintiff informed Dr. Hawkins he was in special education classes in school, but in his Disability Report Plaintiff "said he went through the 10th grade and did not attend special education classes." *Id.* at 21. Accordingly, these inconsistencies support the ALJ's credibility determination.

*Activities of daily living*

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at 603). For example, a claimant's

15

ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding find of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barchart,* 400 F.3d 676, 681 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and boyfriend. She is able to manage her own finances…"). Likewise, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, gardens, and participates in community activities. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009). However, an ALJ must make a specific finding relating to the transferability of the activities to a workplace to refute a plaintiff's allegations of disability. *Orn*, 495 F.3d at 639.

In this case, the ALJ considered Plaintiff's daily activities—which included chores such as taking out the trash, watering the yard, going shopping, watching television, and attending Alcoholics Anonymous meetings—and concluded his activities were inconsistent with his complaints of completely disabling pain and a severe mental illness. (Doc. 11-3 at 21). However, the Ninth Circuit has made clear that the mere fact a claimant engages in normal daily activities "does not any way detract from [his] credibility as to [his] overall disability." *Vertigan v. Halter*, 290 F.3d 1044, 1050 (9th Cir. 2001). The Court continued, "One does not need to be 'utterly incapacitated' in order to be disabled." *Id.* (quoting Fair, 885 F.2d at 603). Rather, an ALJ must make a determination as to whether daily activities are transferrable to a workplace. *See Orn*, 495 F.3d at 639 (the ALJ erred in failing to "meet the threshold for transferable work skills, the second ground for using daily activities in credibility determinations").

Because the ALJ failed to find these activities transferred to work skills, Plaintiff's daily activities do not support the credibility determination. When a reason for an adverse credibility determination is legally insufficient, the Court must consider whether the reliance on an invalid reason was a harmless error. *See Batson*, 359 F.3d at 1195-97 (applying a harmless error standard where part of the credibility finding was invalid). The Ninth Circuit explained, "So long as there remains 'substantial evidence supporting the ALJ's conclusions on credibility' and the error 'does not negate the validity of the ALJ's ultimate credibility conclusion,' such [error] is deemed harmless." *Carmickle*, 533 F.3d at 1162 (quoting *Batson*, 359 F.3d at 1197). Here, the finding regarding Plaintiff's daily

16

activities was legally insufficient.  However, substantial evidence remains, supported by clear and convincing reasons for the adverse credibility determination.

Moreover, the credibility findings were "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." *Moisa*, 367 F.3d at 885.  Therefore, the ALJ's partial reliance an invalid reason in his credibility determination was harmless.

## **CONCLUSION AND ORDER**

For the foregoing reasons, the ALJ set forth specific, legitimate reasons for giving less weight to the opinion of Dr. Hawkins, an examining physician.  In addition, the ALJ stated clear and convincing reasons for finding Plaintiff lacked credibility.  Furthermore, substantial evidence supports the ALJ's evaluation of the medical record and credibility determination.  Consequently, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court.  *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Crist Richardson.

IT IS SO ORDERED.

Dated:   **October 29, 2012**              **/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE